This case this morning is Ford v. Jackson National Life. Case number is 21-1126. Council, when you're ready, you may proceed. Just before I begin, I understand from my client who is trying to observe remotely that only the audio is on and I think she was expecting both video and audio. She asked me to mention something. I'm mentioning something. I don't know if there's anything we can do about it. I think we're on audio only today. Audio only. Okay. I'm prepared. Good morning, Your Honors. My name is David Jaffa. I represent October 2010. Tanya Ford was subjected to blatant forms of sexual and racial discrimination, manifesting themselves in the shocking conduct and unprofessional, boorish, and unpleasant comments at Jackson Insurance Company. She was also subject to retaliation for reporting these items, a hostile work environment and consequently, constructive discharge. On top of all that, in granting Jackson's motion for summary judgment a year ago, the district court abused its discretion by allowing Jackson to violate the court's local rules and ignored a record that is replete with evidence that should allow Ms. Ford to present her case to a jury. Jackson Insurance maintains that the record is insufficient to allow Ms. Ford to proceed to trial and that her allegations of racial and sexual discrimination, retaliation, hostile environment, and constructive discharge are no more than inadmissible hearsay, amounting to nothing more than having shock value. It is Jackson's position that Ms. Ford is unable to present any evidence showing a genuine issue of material fact. Jackson is wrong and so too is the district court and so hold it. I'm going to start with the hostile environment argument, even though that's lower down in the claims. Could I ask you a question about, if you're going to start there, I'd like to start with a question on that issue. You argue that the district court erred in holding that you must show that the sex-based comments and conduct were both severe and pervasive instead of severe or pervasive. If we agree with that argument that the court erred, could we affirm nonetheless on the alternative ground that Jackson's responses to Ms. Ford's hostile work environment complaints were adequate? No, Your Honor, and because they weren't adequate. They were too little too late. For example, and I'll start with the egregious... Well, I guess, can we break this into two parts? One is, if there's some, if there's some merit to the argument, could we rely on it as an alternative ground? That would be question number one. Number two, you're going to address whether there was adequacy in any event. All right, I'll break it down. Rule number one. Can you find, meaning the panel, can the panel find that we have an alternative basis to affirm? That would be severity, because the court went on to discuss severity in his opinion, right? Well, he found pervasiveness was sufficient. U.S. Supreme Court has said all you need is either or. The rule says no material issue of fact. No, to me, means none, zero. So if the court has found there is some material fact, we get to go to a jury. Now, the weight, the sufficiency, all those things, and that is the entire aspect of this case. We have sufficient evidence to put before a jury of Ms. Ford's peers. That is clear from the rule itself that uses the word no, and even after the amendment in 2010 that took out the word pleadings from those things that a court can rely on, although I would argue the rule is currently written. Nevertheless, there is evidence sufficient for pervasiveness. So that's Roman numeral number one, and that gets us through. Now, did Jackson adequately respond? No, they did not. Why? Because it's too little too late. Let's take, for example, and I don't remember the exact exhibit number, and I apologize for that. As the court is a four volumes of the appendix, and I was not able to commit it all to memory. But there is an email from Mr. Lane, the head of HR, at Jackson on October 12 or so, October 12, 2010, the day that Ms. Ford stormed out of the offices after being thrown a very obscene football, which clearly was an indication of the pervasive hostile environment by individuals who had been talked to before many times in an environment that had many events, that this was a lack of judgment on these two individuals' part begs the question, how do you even allow that? So yes, Jackson is going to argue that, hey, right away, HR flew in from out of state to fire these two guys. True, it's a true statement. And Mr. Lane wrote Ms. Ford an email saying, hey, maybe we can talk about this, you know, maybe it's not time for you to go yet, there's things you can do. Well, that discussion should have been had months, if not a year before. You weren't passed over because of race or gender, you were passed over because we want you to get more training, we want you to be better at what you're doing, so wait six months, apply again, and I'm going to just divert for a moment, apply again, because we know from the evidence in the record that it was a very hand-picked situation. It was a good old boy network, right, a bro environment. So hey, I want you to apply for this position, that was normal. So why didn't HR go to Ms. Ford a year before, six months before and say, you know, we think you're a real asset to this company, wait around, we're going to get you that promotion, and sit here. So, your honor, in all due respect, no, it was inadequate. And there is no, I apologize. No, you continue your thought. So just finish the sentence. So it was not appropriate response to her claims that had been going on for years, from already the vodka bottle incident, which I'd rather not, since we are public, I'd rather not describe it, it's in the record, it's very vile, it's very disgusting. So this pattern and practice happened all the time, and Ms. Ford was part of it. What is the effect, you're talking about the football incident, and the head HR person, Mr. Stone, in his declaration says that that's the first time that Ms. Ford had ever mentioned to him race or sexual discrimination. Is there not some obligation to be raising these things as they go along, so that the company can try to fix them? Well, that would be fine if it were supported by the evidence. Mr. Stone also spent months, there was a months long investigation, as the court, the district court pointed out, based on filings and reports from Ms. Ford, long before this. Well that concerned the PIP, and does that really cut in your favor, because it shows that the company took her allegations very seriously, it interviewed several witnesses, the PIP was rescinded, there was a visit with her that they would continue to monitor and investigate any further discrimination. That sounds pretty proactive to me. It is proactive, and I think a jury gets to hear, so what happened after that? That's But now we can say, well, now that you know this is going on, why are there still continuing discussions? How is it that Mr. Brossard gets to say in a manager's meeting, and bookmark that for a moment, that Ms. Ford is not going to rise above a certain level? There's a glass ceiling over here. Now he didn't use those words, those are my words, you're not going to find if you do a search, you won't find glass ceiling in the record. However, there was an implied glass ceiling from Ms. Ford, let her try. Jackson says, hey, that's out of context, you can't know that. Well, Judge Brimmer doesn't know that either, and neither do I, and neither does your honors know what a jury would do with that in context. But Judge Brimmer did know that Mr. Brossard wasn't a regional manager, that it wasn't his discretion that controlled who became an external wholesaler. And that is an excellent point, your honor, I appreciate you bringing it up. Because Judge Phillips, Mr. Brossard seemed to have had a lot of actual control over who got what and whose names went up the chain. That gives him control. If he doesn't have some authority, why is he in a manager's meeting? Why, I mean, the very context of those statements that Jackson claims are, A, hearsay and inadmissible, are in a meeting deciding the fate of Ms. Ford. And apparently he did have some, but yes, at a certain level, it's a legal question, but beyond that, it becomes a factual question. Who has the right to make those decisions? And I believe we can argue constructively, Mr. Brossard had a lot to say. And the evidence would support that he had a lot of influence on people around him. And his animus toward Ms. Ford was such that a jury could find that, in fact, he was a decision maker of a kind that affected her future at the company. But looking at the record as a whole and what the evidence is that's presented, there's nothing from the regional director saying, we wanted to hire her, but Brossard put his foot down or something like that. It's all just surmised, isn't it? I respectfully disagree, your honor. In Mr. Brian Lane's deposition, he specifically said that it was Brossard who did that. And he was an executive vice president, Mr. Lane was an executive vice president. Mr. Lane is a very favorable witness for Ms. Ford and presents a challenge to the other side, but he wasn't a regional director. And he has asked, why do you think she didn't get promoted? And he said, well, she didn't fit the model of white male. And he thought that it was race and sex, but he's not a regional director. Doesn't that matter? No, it doesn't, because he's the vice president of the company. He apparently knew what this environment was. I think that matters a lot. And I, and again, in all due respect, it doesn't matter what I think. I think damages should be X, but you know, when we don't have a box, but when six sit in the box or 12, Judge Bates may rest in peace, put 12 even on a civil case. And so, and I apologize, it's something I used to do with him. And anyway, so when six sit in the box, I think Judge Brimmer put six in the box on a civil case. They decide, they get to decide these things. These are factual matters, not legal matters. And Judge Brimmer most certainly imposed his view on this. And it's not the same as, but let's take a motion to, a motion for a new trial where the rule is very clear that the judge cannot sit as a juror. Well, analogizing, Judge Brimmer most certainly sat as a juror here. And in fact, all the inferences ran toward Jackson. And we cite many examples in the brief, not the least of which is when Judge Brimmer writes, supposing Jackson can bring evidence against pretext. Well, that sentence in and of itself, and that pervades the next five pages of his order. And that I find is a difficulty. Yes, John? I'd just zero in on one question I've been struggling with, and this has to do with your retaliation claim. Do you rely on the same arguments about pretext on the retaliation claim as you do on the discrimination claim? Well, not exactly. I mean, they dovetail. But the retaliation claim is because she makes comments she's threatening to go to EEOC, and that threatens the... No, I understand the theory of the claim. Let me just put it this way. If we were to decide against you on pretext on the discrimination claim, does it follow that we have to affirm on the retaliation claim? It does not. And in fact, because it does not. First of all, you have to know who will review. And so therefore, Rule 56 applies to this court. I know they're separate claims, but I'm just not seeing... What's your separate argument on pretext for retaliation that you haven't already made on discrimination? That the retaliation goes to the inability to move up in the company. The pretext goes to was there discrimination? Was there the failure to promote her for reasons, statistical reasons, that we've cited in the brief? And I think those are separate issues. I see I have 30 seconds left. I'd like to reserve that for some sort of rebuttal, if I may. All right. You'll have some rebuttal time. Thank you, Counsel. Good morning, Your Honors. May it be so. Let me just pick up with right where you left off. I don't think there is any difference. There's any basis to keep the retaliation claim going if the discrimination claim is affirmed because they're the same conduct is at issue. And it can't have been retaliation if it wasn't discrimination in the first instance. And as to the discrimination claim, let's be clear. Before we leave that, this is on retaliation. We have this email, Mr. Bossert, sent to Mr. Stone on September 10, that Ms. Ford shouldn't be promoted to desk director because she would use that position to advance her complaint. That sounds more like retaliation than discrimination. And why isn't that evidence of retaliation that would overcome prejudice? Understood, Your Honor. I think the answer is, the reason why I say it's the same is because at the end of the day, the discrimination or retaliation claim, all of this fails because Mr. Bossert did not have a role in promotions. So his opining about this, which is clearly there's evidence in the record that he had this view of her, it didn't impact anything. And that's why the discrimination and retaliation claim failed. And to the extent there is evidence, there's no doubt, there's some extent that Mr. Bossert had a role, it was to get to the desk, which he did. Just to be clear on what I think you're saying is that even if his email at some level, at least is a move towards retaliation, it actually has to have some impact? That's right. Is that what you're saying? Yeah, it has to have mattered in some way. And the evidence is that there was no discrimination. The evidence of pretext is not there, that the individuals who had responsibility, the regional directors, who had responsibility had good reasons for choosing the people that they did. They were reasons that were recognized and had never been rebutted. That the knowledge of the territory, interviewing skills, perfectly legitimate to leave that kind of discretionary judgment in the hands of regional directors. And those people made those decisions on their merits. And the statistical evidence, which this court said in Turner, statistical evidence has to exclude the possibility of legitimate justification. The statistical evidence here just falls way short of that. It's simply the fact that there hadn't been a black woman promoted to the position, but there's no evidence of the base number, how many people who fit that description applied. And in the absence of that, you can't even come close to eliminating the prospect of a legitimate justification, which is what we have here. And again, I really want to emphasize, there is no evidence, none, that Mr. Bossert had a role in promotions. That's why the discrimination claim failed and that's ultimately why the retaliation claim failed as well. Well, he was consulted, wasn't he? He was consulted at certain levels. He was consulted about that level to get somebody to the short list. And he had a role in that. But she got on the short list. That's the point. She made it that far. And then it was moved. Then it moved from that group to the regional directors. None of his comments came after she got on the short list, which came pretty early. Well, his comments about, to the extent that there's evidence of his comments, and let's be clear, there was a mention about hearsay. Some of the comments, and this was a problem the district court had, some of the comments are hearsay, not in the sense that they're offered for the truth of the matter asserted, but in the sense that they're offered that they were said at all, and the person offering that testimony wasn't there. They heard someone say, Bossert said. So a lot of those comments just... So you're saying they aren't hearsay. So that would be hearsay. Well, hearsay is offered for the truth of the matter asserted. But they just heard someone say, so we don't know whether Mr. Bossert actually said it, is the point. It's the truth of whether... So it's hearsay in that sense, but putting all that aside, and the district court wasn't given a lot of guidance here, and it is their burden at summary judgment to come forward with their evidence. Remember the context of this decision. If the Hugh GEOC case, so sprawling case, that case settles, Ms. Ford exercises her right to go forward, but that puts a burden on her. Tell us about your situation. And instead, she relies on these far-flung allegations. And so I think that's a big part of this from the district court's point of view. And when it comes down to it, the district court had evidence unroboted in front of it that the regional directors made the call based on the regional director's judgments that they have of knowledge of their territories, what kind of impact that the person is most likely to have. By the way, it's no shame not to get an EW position. It's a highly coveted position. Corporations, businesses all the time have situations where there's a training program, people rise up, and there just aren't enough positions for everybody to get the most coveted ones. And that's okay. And look what happened to Ms. Ford. She got the offer from a competitor. That's also okay. That strikes me as far from a case of discrimination. It's a case of someone whose professional career developed. Admittedly, there were inappropriate, there was evidence of inappropriate conduct, but it didn't impact her. And that's a big part of what's going on here. She progressed until she was unable to progress further at Jackson. She got a better offer, and she left. And I think it's telling, Your Honors. I think it's very telling that the two incidents you heard of from counsel this morning, the vodka bottle incident and the football incident, these are the bookends, sort of bookends of the case. One is outside the 300-day limitations period, and under this Court's decision in Duncan, is far afield, way too far afield from the kind of conduct that supposedly makes up the hostile work environment and discrimination claims at issue here to be dragged in. So that's out. And then the other one is after she resigned. So that's what you have. And this is what the District Court had in front of it, right? That wasn't the only evidence. Understood. But my point is, what the District Court had in front of it was the task of figuring out what about Ms. Ford's case? All right. Let me ask you on the hostile work environment. A couple of places in the District Court opinion that I think we need to talk about. At one point, District Court said that because Ms. Ford didn't hear certain racial comments, those comments could not establish a genuine dispute. But that isn't correct. It said it's a matter of law. I mean, we have case law that says that when a plaintiff learns about secondhand, comments secondhand, that those are relevant to the hostile work environment. Yes. Now, let's be clear. I think I broadly stated that what you've stated, Judge Matheson, is absolutely correct. But I think what the District Court was saying in this instance was, and this is in her affidavit, her supplemental affidavit. This is Ford's appendix, page 975. She says after she left the company, she learned. I think what the law is on stuff that you don't hear yourself. That's what the court said. It seems like the court, at least in terms of stating the standard, misstepped. Would you agree? Well, I would say it wasn't artfully put. But in context, I think what the court is saying is it cannot be part of the subjective work experience of the person if they only learn about it after they've left the workplace. Yeah, but that isn't what the court said. Well, that's the way. That's what I think the record shows, and that's perhaps why I'm reading it that way. Okay, I understand your point. But the other issue I'm having, this is at A32 or I guess page 31 of the District Court's opinion, is where, I mean, I really don't understand what happened here. First, the opinion says that this court has explained that the hostile work environment claim may be based on either pervasiveness or severity. And then the very next paragraph, well, the same paragraph, he finds that there's sufficient evidence on pervasiveness. Yeah. But then he says that for the conduct to rise to the level of a hostile work environment, it must be so severe and pervasive. Well, that can't, I mean, something is not matching up. Something's amiss there, and let me see if I can rescue this for the court. I came prepared. I have that page open. I understand the difficulty. I think if you put the whole paragraph, you take the paragraph and you move in the order that the paragraph is talking, and then you look at the context that follows, it starts to make sense, especially in light of the record. First, the first thing it says, top of the paragraph, either pervasive or severe counts. That's the correct statement of the law, right? And it says, it has this peculiar sentence in the middle, alleged triable issue of fact as to whether the conduct was sufficiently pervasive to create an actionably hostile work environment. In what sense is the court using the word pervasive there? I submit to you, it is not in the technical sense that a hostile work environment claim can be either severe or hostile. It's really in the more common sense notion and the more plain English notion that frequency is relevant. The frequency of incidents is relevant to pervasiveness. And this court has said, remember, in Ford v. West, a case of pervasive harassment requires evidence that incidents were, quote, egregious, numerous, and concentrated. And so what the district court was doing was starting the process, trying to figure out, OK, I've decided this is not a severity case. It's a pervasiveness case. How do you figure out pervasiveness? You look at things like the frequency of incidents. You look at things, as Judge Matheson mentioned, the response of the employer. You look at the impact on the work performance of the employee. You look at questions like whether the comments were physically threatening or merely offensive utterances. And it goes through. That's what follows. So look at the end of the paragraph, last sentence. A rational fact finder could conclude that Ms. Ford experienced more than sporadic jokes and comments. Chavez, that's the first question. But just the first question in a pervasiveness case. Were they merely sporadic? If it's merely sporadic, over. I'm done. So I submit to you that pervasive in the middle of the paragraph is referring to frequency. Then you get to the problem of severity in the next sentence, right? The court does not, however, find a genuine dispute as to severity. Again, I think the court's using the term in its ordinary English usage, not in its technical Title VII usage. It's because, remember, one of the issues on hostile work environment, are you talking about things like physically threatening or merely offensive utterances? That's very natural to use the word severe there. And it goes right on. So if we've got this issue, wouldn't it be better, rather than speculate on what the district court might have meant, to let the district court have another go at it? I appreciate that that's a possibility, Your Honor, but in fairness, I think the district court didn't. That's what I'm trying to say. Now, what if we decide against you on that? Your backup plan is adequacy, right? Yes, well, certainly the record is that. And Judge Matlin, you said right at the start, correctly, that the responsiveness would be another way, the responsiveness of the employer. Well, that's what I just said. That's your backup plan. Absolutely, the adequacy. And so let's talk about that. Do you want to address that? Because the district court didn't really address that. Yeah, the district court didn't go there. And let's talk about that. So for the incidents that were called to the attention of Jackson, you have, one, you have the four-page complaint during Mr. Walker's period. That led to, it's not disputed, led to a thorough investigation. It led, first of all, to what? One, supervisors changed from Walker to Blanchett. Even Ford admits Blanchett was not hostile to her in any significant way. It led to monetary compensation. It led to claims of misconduct at the sales desk coming to a halt. Even she admitted the quote-unquote sex talk stopped. The investigation into the supposedly inappropriate use of computers to look at sexually explicit material, that didn't, the investigation was thorough, didn't come up with anything. But again, even Ford admits it didn't continue after the investigation. We talk about the incident involving shortly after President Obama was elected. That was met with swift response and the comments stopped. And as you've already discussed, and as counsel anticipated, yes, it's true that there was the football incident occurred, and it was met with swift and overwhelming reaction. And it's not just that they were fired. But what do you do with the fact that there may have been a response by the employer, but these things kept happening? Yeah, well, they kept happening, although, again, you know, they arise to the level of egregious, numerous, and concentrated, so that they affected her work environment. And that's what the district court looked at. Said, okay, let's look at things like how egregious these were. The most egregious ones were outside the relevant period. There are numerous incidents. When they're brought to the attention of management, they're dealt with. And, mind you, there's no reason to believe it affected Ms. Ford's performance. She continued to progress. These – I submit to you that you look at cases where this court has reversed grants of summary judgment and hostile work environment claims, like Hernandez and O'Shea. Very, very different set of circumstances. You not only have the kind of aggressively routine comments made, they're brought to the attention of management, and management does sort of shrug it off as boys will be boys and doesn't do anything. No relief. That happened in Hernandez, and it has an effect on work performance. Ms. O'Shea was denied resources to effectively do her job. Even the Freeman case in the Fourth Circuit, relied on so heavily, involved exactly that kind of circumstance, where someone had to take a leave because of the barrage of incidents and no relief. This just doesn't look like that. And I submit to you, and I understand I'm over time, the district court did the right thing in running through that analysis. There's no reason to send it back for the court to put the right words in the right places, but ultimately say substantively the same thing. Let me ask you a very short question, which is, this case has something most cases don't, which is Mr. Lane and his testimony. Do you know any cases from our circuit or elsewhere in which we have affirmed a grant of summary judgment with some witness corresponding in stature and position, as well as the directness of his testimony that there's sex and race discrimination? I don't have a site along those lines. Would we be extending the law? I don't think so, for all the reasons I argued earlier about pretext and the undisputed evidence about where the decision-making authority actually lay in this case. Thank you. Thank you, counsel. I'm going to ask for a couple of extra minutes, if I may. We'll give you another. It's equal, and we'll give you a little more than another minute. Thank you. If we have to play twist with district judge's words, we have a problem, and that is not, and it undermines no material fact. Unfortunately, Judge Brimmer misquoted Harris, a U.S. Supreme Court case. He said, he wrote, pervasiveness and severity. Now, I specifically looked it up yesterday in Harris. It's in the disjunctive. It says or. Having decided one, I don't understand why the court even went on. Having decided there was pervasive evidence of hostile work environment, we get to go to a jury. Regarding the vodka bottle, that was the law of the case. I don't think it's appropriate for Jackson to come here today and argue that it's out of time because Judge Brimmer specifically found in his order denying the motion to dismiss that the vodka bottle incident was timely and was part of the case and is a fact in the case and is a material fact, and it does begin a whole series of comments, conduct, and behavior that a jury could easily find that Jackson discriminated against Ms. Ford and the other claims we make. And finally, we have a Seventh Amendment to the U.S. Constitution. It says we should preserve the right to jury trial in federal court. We're in federal court. We have a Rule 56 that can take a case away from a jury when the conditions are met. Those conditions were not met here. And for the very discussion that's been going on for the last 35 minutes or so, that shows that there are material issues of fact and dispute in this case, and we're going to ask the court to reverse the district court and send this matter to a jury. Thank you, counsel. Thanks to both of you for your arguments this morning. It was very helpful. The case will be submitted, and counsel are excused.